RECORD NUMBER: 14-4454

# United States Court of Appeals

### *for the*

# Fourth Circuit

**UNITED STATES OF AMERICA,**

*Appellee,*

– v. –

**RYAN CHRISTOPHER FULTZ,**

*Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT NEWPORT NEWS**

# OPENING BRIEF OF APPELLANT

**EDWIN S. BOOTH**
**SHUTTLEWORTH, RULOFF, SWAIN,**
**HADDAD, & MORECOCK, PC**
**4525 South Boulevard**
**Suite 300**
**Virginia Beach, VA 23542**
**(757) 671-6083**
**ebooth@srgslaw.com**

*Counsel for Appellant*

CP  COUNSEL PRESS • VA – (800) 275-0668

# **Table of Contents**

Table of Authorities.................................................................iii

Statement of Subject Matter and Appellate Jurisdiction ....................1

Statement of issues presented for review..........................................2

Statement of the case .................................................................3

Statement of facts......................................................................5

Summary of argument ...............................................................15

      Expert issue................................................................15

      Motion for new trial ...................................................16

Argument ..............................................................................17

    I.    Expert Issue: the United States District Court erred in
           preventing the proposed defense expert, Carl Rone,
           from expressing a shooting incident reconstruction
           opinion in accordance with Federal Rule Of Evidence
           702 regarding the position of the shooter of the .223
           firearm, in other words that the appellant was not the
           shooter of the .223 firearm.............................................17

           Standard of review.........................................................17

           Argument.....................................................................17

                The Rule 702 and Daubert Factors .........................22

                Weight v. Admissibility ...........................................25

    II.   Denial of Motion for a New Trial: the United States
           District Court erred in denying appellant's Motion for
           a New Trial ................................................................29

i

Standard of Review...........................................................29

Conclusion...........................................................................31

Request for oral argument ................................................ 31

Certificate of Compliance

Certificate of Service

# Table of Authorities

**Cases**

*Daubert v. Merrell Dow Pharms.,*
    509 U.S. 579 (1993) .......................................................... passim

*GE v. Joiner,*
    522 U.S. 136 (1997) ................................................................26

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999) ........................................................18, 19, 27

*Sharpe v. Dir., OWCP,*
    495 F.3d 125 (4th Cir. 2007) ..................................................... 19

*United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi,*
    80 F.3d 1074 (5th Cir. 1996) ..................................................... 27

*United States v. Chavis,*
    880 F.2d 788 (4th Cir. 1989) .....................................................30

*United States v. DeLeon,*
    678 F.3d 317 (4th Cir. Md. 2012) .............................................. 17

*United States v. Fulcher,*
    250 F.3d 244 (4th Cir. 2001) .....................................................29

*United States v. Fultz,*
    2014 U.S. Dist. LEXIS 64695 (2014) ........................................ 15

*United States v. Heath,*
    970 F.2d 1397 (5th Cir. Tex. 1992)............................................28

*United States v. Lester,*
    234 F. Supp. 2d 595 (E.D. Va. 2002) ........................................ 19

*United States v. Wilson,*
    484 F.3d 267 (4th Cir. 2007) ...............................................17, 19

*Wilder Enterprises, Inc. v. Allied Artists Pictures Corp.*,
  632 F.2d 1135 (4th Cir. 1980) ..................................................28

## Rules, Statutes, and Other Authorities

18 U.S.C. 922(g)(1) .........................................................................3

18 U.S.C. 924(c) ..............................................................................3

21 U.S.C. 841(a)(1) ..........................................................................3

21 U.S.C. 841(b)(1)(C) .....................................................................3

28 USC § 1291 ..................................................................................1

Fed. R. App. P. 4(b) .........................................................................1

Fed. R. Crim. P. 33 ................................................................... 16, 29

Fed. R. Evid.  702 ........................................... 2, 4, 17, 18, 19

iv

## <u>Statement of subject matter and appellate jurisdiction</u>

This appeal is from a final judgment of the United States District Court for the Eastern District of Virginia, Newport News Division, in a criminal case pursuant to the Federal Rules of Appellate Procedure.  Fed. R.  App.  P.  (4) (b). Title 28 USC § 1291 states that the United States Courts of Appeal have jurisdiction from all final decisions of the United States District Court.  This Court has jurisdiction over this matter.  Appellant timely filed a notice of appeal from the final judgment of the trial court pursuant to Fed.  R.  App.  P.  4 (b).

## <u>Statement of issues presented for review</u>

The issues presented are:

I.   Whether the United States District Court erred in preventing the proposed defense expert, Carl Rone, from expressing a shooting incident reconstruction opinion in accordance with Federal Rule Of Evidence 702 regarding the position of the shooter of the .223 firearm, in other words that the appellant was not the shooter of the .223 firearm. (preserved: proffer, App. 441-475; objection App. 509)

II.  Whether the United States District Court erred in denying appellant's Motion for a New trial, on the grounds that the proposed defense expert, Carl Rone, should have been permitted to express an opinion as to the position of the shooter of the .223 firearm. (preserved: App. 748-768).

# **Statement of the case**

On March 13, 2013 the United States filed an indictment against the

appellant in United States District Court – Newport News division,

charging three crimes:

| | |
|---|---|
| Count One: | Possession with Intent to Distribute Cocaine Base, 21 U.S.C. 841(a)(1) and (b)(1)(C), a Class C Felony (20 years, $1,000,000 fine, at least 3 years supervised release and a $100 special assessment) |
| Count Two: | Possession, Brandish and Discharge of a Firearm in Furtherance of a Drug Trafficking Crime, 18 U.S.C. 924(c), a Class A Felony (10 years to Life, consecutive, $250,000 fine, and $100 special assessment) |
| Count Three: | Felon in Possession of a Firearm, 18 U.S.C. 922(g)(1), a Class C Felony (10 years, $250,000 fine and a $100 special assessment) |

The appellant entered a not guilty plea to all counts, and a jury trial

began on February 4, 2014 before the Honorable Henry Coke Morgan, Jr.,

United States District Judge.

The government's basic contention at trial was that a drug transaction destabilized into an argument, which led to a shoot-out, and that appellant brandished and discharged an AR-15 rifle in .223 caliber in the course of the gunfight.

The appellant's trial counsel requested and ultimately received funding to retain an expert, Carl Rone, who would testify in the area of shooting scene reconstruction.[1]  The trial court, acting as gatekeeper of expert opinions, did not allow Mr. Rone to express certain opinions in accordance with Federal Rule of Evidence 702 during the trial.  That ruling – and the related ruling on a motion for new trial – are the issues on appeal.

The jury returned a verdict of guilty on all counts after four days of trial.  On May 22, 2014, the appellant was sentenced to 360 months in the United States Bureau of Prisons, and five years of supervised release.

The appellant timely noted his appeal.

---

[1] The cost and proper allowance for experts in court-appointed cases was an issue leading up to trial.  However, this was ultimately resolved, and has no bearing on this appeal.

## **Statement of facts**

The government's evidence at trial was that the appellant, and two other men - David Andrews also known as D'Nice and Randall Woods - made a plan to sell cocaine at a Walmart in Hampton, Virginia on December 27, 2011, and that the plan destabilized into a gunfight in the parking lot of the Walmart.

Kenneth B. Hinton, also known as Kenny Boo, testified that he arranged the drug transaction. App. 130. He testified that he met with Christopher Vinson, also known as Scooby, who asked him to make a phone call to obtain crack cocaine. App. 130. Hinton spoke with Andrews, and set up a meeting between Andrews and Vinson. App. 132. Robert Murphy – the person who wanted the crack cocaine in the first place – came along with Christopher Vinson to the meeting with Hinton. App. 132. Murphy testified that he rode with Vinson to the Walmart on December 27 to obtain crack cocaine. App. 142 – 43. Murphy testified he was obtaining $50 or 1 gram worth of crack cocaine from Andrews. App. 145. Murphy and Vinson drove from Hundlack to Walmart in a Ford Taurus, and met Vinson, Woods, and the appellant, who arrived in a Dodge Charger.

Murphy and Vinson parked in the open space depicted on Government's Exhibit 13, to the right of the white car and left of the green

5

Mazda. The front of the car was pointed towards the Charger; in other words they did not back into the space. App. 154, 157; 687 (Photo/Ex. 13). Murphy testified the Charger was parked in front of the green Mazda, ahead and to the right of the car he was sitting inside. App. 155.

Vinson and Andrews got out of their cars, began arguing, and Murphy testified this was because Vinson "snitched" on Andrew's brother. App. 146. According to Murphy, Andrews ran to Vinson's side of the car, and another man (Woods) ran to his (the passenger) side of the car. App. 146. Woods, who Murphy didn't know but described as "another guy" with a pistol in his waistband, asked why Vinson "brought this white guy up here." Vinson said it wasn't his business; Woods called him a snitch. App. 148. Vinson and Andrews exchanged gunfire "right beside the car." App. 149.

Murphy testified that the appellant got out of the charger with the door cracked and pointed an AK-47 at the window, and the windshield broke. App. 149. Murphy identified the appellant, and said that he was firing from the passenger side of the Dodge charger. He said he believed he had an AK-47, with a banana clip. Murphy had used heroin earlier in the day, and said that he wasn't "too high" and had a recollection of what happened, although he still had a buzz. App. 170.

6

When the shot broke the windshield, Murphy tried to drive away and ran into a tree.  App.  153. The government admitted a diagram, Exhibit 1 and 1-A depicting the spaces for the location of the Dodge Charger and the Ford Taurus, and Murphy testified where the vehicles were located during the gunfire.  App.  160; 683-84.

David Andrews testified for the government.  Andrews said that on December 27 he had a Bushmaster AR-15 rifle in the backseat of his car. He said that it was a black rifle, with a carry handle and a 30 round magazine in .223 caliber.  App.  260 – 261.  Andrews testified that the appellant said he wanted a gun if he was going to be riding around with them.  App.  263.  Andrews said he was carrying a Glock chambered in .357 SIG, and that Woods was carrying .45 Auto pistol.  App.  263-264.  He testified similarly about Hinton a/k/a Kenny Boo arranging the crack transaction, and driving to Walmart.  He was driving, Woods was in the front passenger seat, and the appellant was in the backseat.  App.  265. Andrew said - when he didn't see Kenny Boo - he thought it was a set-up, because Vinson had – as he understood things – told the federal government on Andrews' brother for dealing drugs.  App.  267.  Andrews said he and Vinson got into a fight, and Vinson ran towards Woods and put his gun in his face.  App.  269.  Vinson fired a shot, and then began shooting

7

his weapon at the charger.  App.  270.  Andrews testified he saw the appellant firing the AR-15.  App.  270.

Christopher Vinson testified for the government.  He testified substantially similar to Robert Murphy as to his role in the alleged drug transaction, and said he had the 9 mm Beretta.  App.  374.  Vinson began arguing with Andrews about telling the government about Andrew's brother, and drew his weapon and fired at Woods, who had a black semiautomatic firearm by his side.  App.  374.  He further testified that someone who he didn't know, but described as wearing a burgundy white and gray jacket, was standing by the passenger side of the Charger with the door open and firing "a rifle or something like that."  App.  375.  Vinson shot 10 to 11 times with the 9mm. Vinson reviewed government's Exhibit 1 and 1-A and testified that he was at the back of that Taurus, close to the right side, when he was shot for the first time and fell to the ground.  App. 397.

According to Andrews, the appellant ran or walked inside the Walmart with Woods, and later met up at a hotel room Andrews had at the Best Western.  App.  272.  Andrews testified that the appellant was shot, but nonetheless took the AR-15 with him and got into another car belonging to Andrews, and that all three men drove to a house on Dresden Drive to drop

off the AR-15. App. 273 – 275. The alleged AR-15 firearm was never recovered.

Ashley Frescatore testified as an employee of the Hampton Police Division's Forensics Unit. She photographed and recovered the evidence in this case. This evidence included all of the shell casings, bullet jackets and fragments, and photographs admitted in the case, as well as a 9 mm Beretta firearm and Rock Island Armory .45 Auto. These included 9 mm Luger and .380 auto bullet jackets and cores, as well as shell casings – .357 SIG shell casings, and .223 Remington shell casings. *See* App. 723 (Certificate Of Analysis/government Ex. 53).

She also prepared government Exhibit 2, which is a relational diagram of the shell casings and bullets found at the scene. App. 241-244; 678 (Gov't Ex. 2). Exhibit 2 is not to scale. App. 247. Ms. Frescatore recovered three .223 caliber shell casings at the scene, and a fourth casing inside the door of the Dodge Charger, which was located not too far away from the Walmart, in a restaurant parking lot, shortly after the shooting. App. 242.

Courtney Etzelmiller testified as a forensic scientist in the field of firearm identification with the Virginia Department of Forensic Science. Her testimony tied the 9 mm Luger bullet jackets as being fired from the

Beretta 9 mm found at the scene, and prepared the certificate of analysis of the forensic firearm evidence. App. 329. She never examined any .223 bullets, bullet fragments, or bullet jackets. App. 333.

Special Agent Banks with the Bureau of Alcohol, Tobacco and Firearms interviewed David Andrews about the .223 rifle. Based on this interview, and the particular logo or insignia of the Bushmaster brand as observed and relayed to him by appellant's codefendant, David Andrews, he testified as an expert that the .223 caliber rifle David Andrews described was a Bushmaster rifle manufactured in the state of Maine. App. 346. Agent Banks testified that AR-15 rifles generally eject their spent casings to the right and rear, and on cross examination, he testified that it was not possible to know which direction - it was not specified exactly which direction, as opposed to general direction, but that is probably a fair assessment of the testimony – a particular firearm would eject its spent cartridge casings. App. 349.

In terms of actual footage of the shootout, Detective Baer with Hampton Police Department obtained Walmart security video. The videos are attached to the appendix at App. 732. Detective Baer testified that the video was not helpful to him in terms of who was shooting in the course of the encounter, but that he was able to identify the appellant running from

10

the parking lot, falling, and making his way into the Walmart.  App. 414 –
415.  He testified that Woods also ran, and hid behind a car at the side of
business.  App.  415.

Plaintiff's proposed expert witness, Carl Rone, testified outside the
presence of the jury as a proffer for the trial court.  Mr. Rone testified that
he has an Associate degree in accounting, attended several week-long
shooting scene reconstruction courses over number of years, and testified
in state courts as an expert in shooting reconstruction, forensics firearms
examination, gunshot residue and distance determination.  App.  444, 453.
Mr. Rone had not qualified in federal court in shooting scene
reconstruction.  App. 445.  He based his opinion on the evidence,
photographs, surveillance video, and testimony of witnesses.  App.  445,
447.

During the proffer testimony, the trial court asked for a
straightforward recitation of the essence of Mr. Rone's opinion.  App.  454
– 455. Mr. Rone was asked this question: "[w]hat would your opinion be
about where the shooter of the purported .223 would have to be standing,
based on the information in this case, and why did you come to that
conclusion?" App. 456.  He responded by answering that, in a normal
shooting position standing upright, the ejection of casings should be to the

11

right and to the rear. In other words, the casings would not drop directly to the ground at the shooter's feet. Therefore, it is his opinion that the appellant could not have been standing where he was described by the witnesses, because the cartridge casings would not be concentrated in that area as depicted in government Exhibit 2. App. 546; 685 (Gov't Ex. 2). Mr. Rone further testified that the ejection pattern to the right in the rear, would necessarily put the AR-15 shooter forward and to the left – in other words, not where the appellant was said to be located by the witnesses who testified against him. App. 458.

Mr. Rone further testified that, on clip number six of the Walmart surveillance video, muzzle flashes are visible from the Ford Taurus vehicle as it backs up out of the parking space. App. 467.

The court summarized his opinion as:

> Well, based on your opinion as set forth in this letter of January 30th, you felt that the location of the shell casings from the .223 cartridges indicate that the shooter would not have been standing anywhere in the parking place where the Charger was. Is that right? App. 468.

Mr. Rone confirmed that was his opinion, and that his opinion was supported by the fact that the video depicts the appellant running away from shooting scene. App. 468.

Following the proffer, the trial court held that the testimony was not the proper subject of an expert opinion, and that there was insufficient

12

scientific or technical evidence to support the opinion.  The trial court

based this on the fact that the Ford Taurus and Dodge Charger were moved

before the casings were retrieved, and that there was no indication that the

shell casings were in the same place at the time of retrieval as they were at

the time the weapon fired.  The trial court held that the testimony was

entirely speculative. App. 471.  The court further held that it was not a

question of qualifications but of the basis from which he formed his

opinion.  App. 475.

The trial adjourned for the day.  Prior to adjournment, the trial court

permitted appellant's counsel to brief the issue, which she did. App. 478.  In

that memorandum of law, appellant's counsel argued that the opinion was

the proper subject of expert testimony, and that the basis of the opinion

was question of weight and not of admissibility.

The following day, Mr. Rone was recalled as a witness outside the

presence of the jury, and answered additional proffer questions.  The court

permitted Mr. Rone to testify that the weapon normally ejects casings to the

right and rear of where the shooter is located. App. 507.  The court also

allowed him to testify that flashes in the surveillance video were muzzle

flashes. App. 509.

Mr. Rone testified regarding two primary points in the presence of the jury.

First – as the jury viewed the video –that the flashes in surveillance video clip six (at 5:26:50 according to the date and time stamp in the purple strip at the top of the screen as the clip is played) are muzzle flashes. App. 739.  He testified similarly regarding clip five, and said that muzzle flashes were flashing when the Ford Taurus sped off.  App.  527 (same time stamp as clip 6).

Second, Mr. Rone testified that a Bushmaster AR-15 has a standard ejection pattern to the right and rear. App. 533.  He was, in accordance with the court's ruling, not permitted to express an opinion as to the location of the .223/AR-15 shooter.

Detective Baer was called by the defense, called in rebuttal by the government, and when questioned by counsel for the government expressed an opinion that he did not see any muzzle flashes in the Walmart video. App. 591.

The government concluded its rebuttal case, instructions and closing arguments were presented, and the appellant was convicted. He filed a motion for a new trial, which was briefed and ultimately denied by a letter opinion and order from the trial court. App. 798; *United States v. Fultz,*

14

2014 U.S. Dist. LEXIS 64695 (2014).  The court sentenced the appellant to

360 months in federal prison, and this appeal followed.

## Summary of argument

### *Expert issue*

The trial court erred in preventing the proposed expert from

testifying, because he had sufficient specialized knowledge to help the trier

fact understand the evidence and/or determine a fact in issue.  In plain

words, the expert could have told the jury that someone shooting this AR-15

rifle couldn't be standing by the Dodge Charger, where most of the casings

were found, because the spent casings fly out of the rifle and land

somewhere else.

His testimony was based on sufficient facts, and the product of

reliable principles regarding normal .223 caliber AR-15 ejection patterns,

which were effectively and reliably applied to the facts of this particular

case.  Any reservations from the trial court regarding the basis of the

opinion were properly a question of fact for the jury, to be determined in

their discretion as to the appropriate way to apply to the expert testimony.

Instead, the court made determinations regarding the sufficiency of the

evidence used to reach the opinion, and the probability of the findings to

support the reliability of his opinion, which invaded the province of the jury to make a determination as to whether or not the opinion was valid.

### *Motion for new trial*

Pursuant to Federal Rule of Criminal Procedure 33, appellant filed within 14 days of the date of judgment a motion for new trial.  The reasons for the new trial include, but are not limited to, the testimony of the proposed expert. In that sense the issues are identical, however the motion for new trial was fully briefed, and the trial court entered a written order addressing the decision. Although entwined with and similar to the gatekeeping decision regarding the expert, denial of the motion is a separate and distinct decision of the trial court and, therefore, requires a separate and distinct presentment on appeal.

## Argument

**I.**    **Expert Issue**: the United States District Court erred in preventing the proposed defense expert, Carl Rone, from expressing a shooting incident reconstruction opinion in accordance with Federal Rule Of Evidence 702 regarding the position of the shooter of the .223 firearm, in other words that the appellant was not the shooter of the .223 firearm.

## Standard of review

The standard of review applicable to the denial of expert testimony is abuse of discretion; "We review for abuse of discretion the district court's decision to admit expert testimony under Federal Rule of Evidence 702." *United States v. Wilson*, 484 F.3d 267, 273 (4th Cir. 2007).[2]

## Argument

The standard for admission of expert testimony is codified under Federal Rule of Evidence 702, which states:

---

[2] Appellant suggests a good-faith extension of the law, and a less deferential standard of review of expert exclusion in criminal cases, but recognizes that this Court considered the same issue recently, and applied the abuse of discretion standard; " DeLeon contends that the district court's limitation on his expert's testimony violated his constitutional right to present a complete defense and that we should therefore  review his claim de novo. DeLeon's attempt to elevate his claim to the level of a constitutional violation is unpersuasive." *United States v. DeLeon*, 678 F.3d 317, 329 n.4 (4th Cir. Md. 2012).

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)   the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

In this case, the trial court apparently had no objections with the knowledge, skill, experience or training of the proposed expert. Instead, the issues focused on the basis of the opinion. The basis of the opinion was a blend of technical knowledge – such as knowledge about the typical ejection patterns of an AR-15 firearm – and experience, gained by actually shooting these weapons and having familiarity with where the shell casings actually land.

In terms of evaluating the basis of an opinion, the United States Supreme Court stated that "*Daubert's* general principles apply to the expert matters described in Rule 702. The Rule, in respect to all such matters, "establishes a standard of evidentiary reliability." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (quoting *Daubert v. Merrell Dow*

*Pharms.,* 509 U.S. 579, 590 (1993)). This is "flexible" inquiry, and the *Daubert* factors do not mandate a "definitive checklist or test." *Id*[3].

While the test itself is flexible, the appellant acknowledges the relatively deferential standard governing reliability – described as " considerable leeway" –  under which decisions on experts will be reviewed on appeal; "Rule 702 grants the district judge the discretionary authority, reviewable for its abuse, to determine reliability in light of the particular facts and circumstances of the particular case." *United States v. Wilson*, 484 F.3d 267, 273 (4th Cir. Md. 2007) (quoting *Kumho Tire*, 526 U.S. at 158). However, "[a]n abuse of discretion can flow from "a failure or refusal, either express or implicit, actually to exercise discretion, deciding instead as if by general rule, or even arbitrarily, as if neither by rule nor discretion." *Sharpe v. Dir., OWCP*, 495 F.3d 125, 130 (4th Cir. 2007)(internal citations omitted).

---

[3] In *Daubert*, the Supreme Court identified four factors that trial courts should consider when evaluating the reliability prong of *Daubert/ Kumho*: (1) Whether the theory or technique used by the expert can be, and has been, tested;(2) Whether the theory or technique has been subjected to peer review and publication;(3) The known or potential rate of error of the method used; and (4) The degree of the method's or conclusion's acceptance within the relevant scientific community. *United States v. Lester*, 234 F. Supp. 2d 595, 598 (E.D. Va. 2002)

The trial court erred in refusing to allow Mr. Rone to testify to his opinion on the location of the AR-15 shooter. The trial court summarized its findings in a written opinion, which was in response to the motion for new trial, but in effect addressed the court's reasoning for the denial of expert testimony. App. 813.  The court gave four supporting reasons for the denial:

i.    that the expert provided insufficient information on the methodology supporting his opinion on the location of the AR-15 shooter;

ii.   insufficient evidence to support the opinion;

iii.  no degree of probability of findings to support the reliability of the opinion; and

iv.   that the primary crime scene, in other words the Walmart scene, was compromised by the movements of the shooters in the vehicles.

During his proffered testimony, Carl Rone stated that he testified over 500 times as an expert in the state and federal courts.  This testimony was in a number of shooting disciplines, or testimony regarding firearms, and in this case Mr. Rone analyzed the scene based on the materials that were available to him.  These included photographs, the certificate of analysis, diagrams prepared by the police, and the testimony of witnesses at trial as well as the Walmart video.  He then applied his knowledge and experience to the information that was available.

20

Mr. Rone proposed two alternative opinions, both of which were inconsistent with an AR-15 shooter standing where witnesses described the appellant standing. The first opinion is that AR-15's in standard configuration eject their spent brass to the rear and right. The second is that some AR-15's are configured to eject their spent brass forward.

The trial court summarized these opinions correctly in its opinion and order. App. 801. However, a crucial component of the proposed expert opinion is that AR-15's do not generally drop their brass directly where the shooter is standing. Mr. Rone was very clear about this fact. App. 456. His opinions are, in a sense, like a set alternative facts in support of civil liability in a lawsuit: whether the spent casings go to the front or to the rear, either way they would not land at the feet of the shooter. The person firing the AR-15 is in the center of a invisible ring – like the face of the clock where the hands attach – and the edge or diameter of the ring is represented by the maximum distance that casings would fly through air, which could not be predicated with certainty. Although it wasn't represented in court by this illustration, Mr. Rone's testimony could be fairly summarized as saying that the casings would wind up somewhere between 3 o'clock and 6 o'clock (to the right and rear) <u>or</u> somewhere

forward like 1 o'clock (for forward ejection) but in any event not in the middle at the shooter's feet.

The opinion, and the argument defense counsel wanted to support with the opinion, was that because shell casings would not land at the shooter's feet, the witnesses who testified that Appellant was by the front passenger door of the Charger were mistaken or lying. That theory could have been addressed with competing evidence and argument by the government, instead of preclusion of the evidence.

### The Rule 702 and *Daubert* Factors

- *the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue*

In this case, the jury was charged with determining if the appellant used a firearm – an AR-15 – in the commission of a drug crime. The proposed expert had specialized knowledge regarding how AR-15 firearms generally eject their spent brass. In a normal shooting position, that is to the right and rear. App. 446. This exchange in voir dire summarizes the issue and proposed testimony:

THE COURT: So you're basing -- you're saying you don't think the shooter was standing anywhere in that parking space where the Charger was because of where the casings were found.

THE WITNESS: Right. If the casings are here, the shooter should be in this direction, away from the casings, because they're going that way. With them ejecting to the right and to the rear you would put the shooter forward and
left of them.

App. 458

That testimony would help the jury determine whether or not the government was correct in its allegation that the appellant was the shooter of the AR-15 firearm.

- *the testimony is based on sufficient facts or data*

Mr. Rone based his opinion on the location of the shell casings found in the parking lot, the Walmart surveillance video, as well as his knowledge of the general characteristics of AR-15 firearms.  The particular weapon in this case was a Bushmaster AR-15.  Mr. Rone is familiar with how that firearm typically ejects spent cartridges.  It is true that he did not have the actual firearm, and that the spent shell casings landed on the parking lot before the cars drove away.  However, there were several shell casings located in the parking lot, and as the government's exhibits demonstrate, a majority of these casings were located beside the Dodge Charger. App. 818. Multiple casings in the same location would tend to suggest that the shooter

23

held the firearm consistently, resulting in an equally predictable pattern of casings on the ground.

Under ideal circumstances, the expert would like to have the firearm, a totally undisturbed crime scene, and clear video. However, the absence of these does not completely eliminate the ability to draw appropriate conclusions based on sufficient facts or data.

- *the testimony is the product of reliable principles and methods*

The principal or method at issue under this inquiry is whether or not the firearm – which neither the government nor the defense had an opportunity to examine – functioned as a typical Bushmaster AR-15 firearm. That is to say, ejecting its shell casings to the right and to the rear or, rarely, forward. There is no particular scientific or medical testing here, only whether or not a machine functioned as it typically would, and as intended by the manufacturer. The principles and methods the expert applied were his own AR-15 shooting experience, with regard to the ejection to the right and rear, and information learned in an AR-15 forum on the Internet.

Reliance on information gained from an Internet forum or chat room (as described by the trial court) is not ideal, and wouldn't be anyone's first

choice for a source of authority, but it is entirely likely that in the shooting and firearms community this is a common a way to share information.

- *the expert has reliably applied the principles and methods to the facts of the case*

In terms of reliable application, the expert used the information that was available to him, and applied his knowledge of AR-15 rifles. The evidence established that a majority of the shell casings – and there appear to be enough casings to establish a pattern – landed immediately beside the Charger, and from that information the expert can draw a conclusion that the shooter was standing in basically one location, while the spent shell casings flew through the air and landed in another location.  See App. 737 (stating that the handgun shooters were moving throughout the crime scene, but not mentioning movement on the part of the rifle shooter). The expert stated that it is unlikely that the spent casings would wind up at the foot of the shooter. He believed the shooter was located to the front and left of the Dodge Charger, beside the blue van.  App. 737.

**Weight v. Admissibility**

The trial court explained its decision in a written opinion. Part of the reasoning included the view that "no degree of the probability of his findings [existed] to support the reliability of his opinion" App.  813.   The

opinion focuses on a number of factors, including the fact that the crime scene was disturbed and that the expert lacked the actual firearm. In the context, the term "probability" could refer to a level of certainty as to how the firearm ejected, i.e. forwards or backwards, the ejection distance of the particular .223 cartridges, or number of other factors at issue in the case.

However, a consideration of probability is a consideration of the weight of the evidence, and the decision that should be left to the jury; "*Daubert* quite clearly forbids trial judges from assessing the validity or strength of an expert's scientific conclusions, which is a matter for the jury." *GE v. Joiner*, 522 U.S. 136, 154 (1997)( Stevens, J., dissenting). Rather, as the *Daubert* court held:

> We conclude by briefly addressing what appear to be two underlying concerns of the parties and amici in this case. Respondent expresses apprehension that abandonment of "general acceptance" as the exclusive requirement for admission will result in a "free-for-all" in which befuddled juries are confounded by absurd and irrational pseudoscientific assertions. In this regard respondent seems to us to be overly pessimistic about the capabilities of the jury and of the adversary system generally. Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.

*Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 595-596 (1993)[4]

---

[4] This same basic principle is expressed in the Comments to FRE 702:

In this case, the jury would need an expert to tell them how an AR-15 rifle functions mechanically, and where it ejects its spent casings. And Mr. Rone did testify regarding objection patterns. App. 535. But he was not permitted to tie that testimony to the location of the shell casings, and express an opinion on where the shooter was located. If he had been permitted to express this opinion, a jury would be perfectly capable of deciding on their own how much emphasis to place on that opinion in the face of cross-examination on all the factors that concerned the court.

The questions of movement of shell casings, shooting position, angle, and other concerns of the trial court are, in part, concerned with the

A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule. *Daubert* did not work a "seachange over federal evidence law," and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1996). As the Court in *Daubert* stated: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 595. Likewise, this amendment is not intended to provide an excuse for an automatic challenge to the testimony of every expert. *See Kumho Tire Co. v . Carmichael*, 119 S.Ct.1167, 1176 (1999) (noting that the trial judge has the discretion "both to avoid unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises.").

27

assumptions Mr. Rone made in forming his opinion. And this Court has held that "[t]he asserted fallibility of the expert's assumptions affected the weight of his testimony, not its admissibility." *Wilder Enterprises, Inc. v. Allied Artists Pictures Corp.*, 632 F.2d 1135, 1144 (4th Cir. 1980)(addressing proposed expert testimony regarding damages in an antitrust case).  Other Circuit Courts of Appeal have ruled similarly; "[a]s a general rule, "questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than the admissibility and should be left for the jury's consideration." *United States v. Heath*, 970 F.2d 1397, 1405 (5th Cir. Tex. 1992)( holding that an opinion should have been allowed in a fraud case, but that the error was harmless; the "[proposed expert] had specialized knowledge and experience in the field of real estate closings, which were beyond the knowledge and skills of the jurors. The absence of scientific data supporting his opinions went to the weight the jury should have accorded them. The error, however, was harmless.").

*Daubert* does stand for the proposition that a trial court can appropriately block evidence if the conclusion is too speculative based on the available facts or methodology employed, but in this particular case the trial court abused its discretion by blocking the testimony. This was not a

case about chemistry, medicine, a complicated scientific process, or calculation of complex money damages. It was much more simple and mechanical, and testimony that a shooter couldn't be where other people said he was - because a particular gun usually ejects its spent casings out in a particular direction - is the sort of testimony a jury can appropriately consider along with all the other evidence. For that reason, the opinion should have been admitted into evidence.

**II.**     Denial of Motion for a New Trial: the United States District Court erred in denying appellant's Motion for a New Trial

**Standard of Review**

The standard is abuse of discretion; "[w]e review a district court's denial of a new trial motion for a new trial for abuse of discretion. *United States v. Fulcher*, 250 F.3d 244, 249 (4th Cir. 2001).

The five-part test a trial court should use in evaluating a Motion under Fed Rule. Crim. Pro 33, is "to receive a new trial based on newly-discovered evidence, a defendant must show that: (1) the evidence is newly-discovered; (2) he has been diligent in uncovering it; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material to the issues involved;  and (5) the evidence would probably produce an acquittal."

29

*United States v. Chavis*, 880 F.2d 788, 793 (4th Cir. 1989)(internal citations omitted).

In this case, the motion for a new trial focused on additional materials and argument in support of the expert witness Carl Rone. The trial court considered the additional written materials, and stated in the written opinion that "defendant cannot show that the [the additional materials] would probably result in an acquittal." App. 806 The trial court also made it clear that the additional materials would not have made a difference in terms of the court's decision not to permit the expert to express an opinion on whether the appellant was the AR-15 shooter; "[i]t appears that Defendant is assuming that the Court would have admitted Mr. Rone's testimony if the additional literature would have been offered. As discussed below, the lack of scientific support for his testimony was only one such concern that the Court had concerning his proposed testimony." *Id.* (n. 9).

In terms of the effect of the denial of expert testimony, the appellant maintains that the proffered opinion was key to the defense, absolutely necessary, and likely to result in an acquittal. Although separating the Issues Presented for Review seems necessary because of the procedural history of the case at the trial level – with rulings on the same issue both during and post-trial – repeating essentially identical arguments does not.

30

Instead, the appellant incorporates his previous arguments on the expert issue by reference.

## **Conclusion**

For the foregoing reasons, the Appellant requests that this Court issue an order vacating the judgment and remanding the case for retrial.

## **Request for oral argument**

Counsel for the appellant requests oral argument.

Respectfully submitted,

/s/ Edwin S. Booth

Edwin S. Booth
SHUTTLEWORTH, RULOFF,
SWAIN, HADDAD &
MORECOCK, PC
Suite 300
4525 South Boulevard
Virginia Beach, VA 23452
757-671-6083
ebooth@srgslaw.com

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. <u>14-4454</u>          **Caption:** <u>U.S. v. Ryan Christopher Fultz</u>

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[✓]     this brief contains _____6,439_____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[ ]     this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[✓]     this brief has been prepared in a proportionally spaced typeface using
<u>Microsoft Word 2010</u> [*identify word processing program*] in
<u>14 Point, Georgia</u> [*identify font size and type style*]; **or**

[ ]     this brief has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) <u>Edwin S. Booth</u>

Attorney for <u>Appelant</u>

Dated: <u>9/26/14</u>

# CERTIFICATE OF SERVICE

I certify that on  9/26/14  the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

OFFICE OF THE UNITED STATES
ATTORNEY
Robert Edward Dradenham, II
Assistant U.S. Attorney
Timothy Richard Murphy
Special Assistant U.S. Attorney
Fountain Plaza 3
721 Lakefront Commons Suite 300 Newport
News VA 23606-0000
757-591-4000
bob.bradenham@usdoj.gov
timothy.murphy2@usdoj.gov

/s/ Edwin S. Booth

Signature

9/26/14

Date